IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA

      v.                              Case No. 19-cr-00044-wmc

PATRICK O'CONNOR,

      Defendant.

---

GOVERNMENT'S SENTENCING MEMORANDUM

---

INTRODUCTION

The United States of America, by its attorneys Scott C. Blader, U.S. Attorney for the Western District of Wisconsin, and Aaron D. Wegner, Assistant United States Attorney, hereby submits this memorandum to aid the Court in the sentencing of the defendant, which is currently set for July 30, 2019.

FACTS

The facts underlying the criminal charges in this case are not in dispute and are accurately recounted in the Presentence Investigation Report ("PSR"). In summary, during the relevant period, the defendant solicited funds from several individuals for investment in an entity he created entitled "Madison Financial Services." As part of his solicitations, the defendant made various material misrepresentations to investors regarding Madison Financial Services. For example, the defendant represented that

Madison Financial Services would invest all of the investors' funds into a TradeStation online brokerage account. The defendant represented that he would use the TradeStation account to actively trade purchased securities and he projected an average annual return on the investment of 2% a month, or 24% annually. In total, the defendant convinced six investors to invest over $12,000,000 with him.

In fact, the defendant used a large portion of the investors' funds for his own personal expenses, including expenses related to his real estate development business and to repay other investors. In addition, of the funds that the defendant actually deposited into his TradeStation accounts and actively traded, he either lost or withdrew the vast majority of the funds and rarely generated any profit.

To further perpetuate the fraud, the defendant provided investors with purported account statements from their investments with Madison Financial Services. The account statements were fictitious and showed the investors' supposed year-to-date profits and their supposed current portfolio balance. In addition, the defendant made Ponzi-style payments to some investors and stated that the money was interest income earned from their investment in Madison Financial Services.

On October 26, 2017, a special agent from the Internal Revenue Service ("IRS") visited the defendant at his home in Waunakee. During the interview, the agent questioned the defendant regarding the particulars of Madison Financial Services and its investments. Specifically, the agent inquired about a $500,000 check from an investor where only $300,000 was transferred into the defendant's TradeStation account. Records showed the defendant used the remaining $200,000 to pay off a real estate loan

and for various personal expenses. When pressed to explain the transactions, the defendant lied to the agent and stated the investor was also investing in his real estate company. The defendant also falsely stated that any remaining money used for his own personal expenses came from a fee charged to the client for his services.

While a visit from a federal agent inquiring about illegal conduct should have a chilling effect on most people, the defendant's operation of Madison Financial continued unfettered. In fact, several months after the agent's visit, the defendant accepted $1,000,000 from one investor and $745,000 from a second investor. The defendant's involvement with Madison Financial Services continued until June of 2018 when agents interviewed multiple investors and discovered the full extent of the fraud scheme. At the time the defendant was charged in this case, the government had identified five investors in Madison Financial Services who had lost a staggering total of $9,686,848.[1]

## GUIDELINES

The advisory Guidelines computation, as set forth in the Presentence Investigation Report ("PSR"), has the total offense level at 30 and a criminal history category of I. (PSR ¶¶ 94, 97). The resulting guidelines range is 97-121 months in prison. (PSR ¶ 124). The parties agree that that this guideline range is correct.

---

[1] The defendant paid back the sixth investor in full by using money provided to him by other investors.

ARGUMENT

A.      Nature, Circumstances, and Seriousness of the Offense

The defendant's conduct in this case involved stealing over $9,000,000 from five investors between 2011 and 2018. While the loss amount alone makes this a very significant offense, the Court should also consider that the defendant's criminal conduct spanned a seven-year period. During this time, the defendant meticulously planned and executed a fraud scheme that allowed him to dupe investors. Instead of transferring the money into his TradeStation account as promised, the defendant used it live a lavish lifestyle well beyond his means. He also used the investors' money to make seemingly generous gifts to charities and his children. All the while, the defendant smoothly covered his tracks by providing investors with false account statements, making Ponzi-style payments, and creating and distributing IRS 1099 forms. When his cash flow started to run low and the risk of exposure increased, the defendant simply solicited more money from investors.

The defendant's fraud scheme significantly impacted each of the investors in a multitude of ways.[2] (PSR ¶¶ 17-39). For example, two investors (husband and wife) provided the defendant with nearly $5,000,000 between 2013 and 2018. (PSR ¶ 23). The investors' victim impact statement explains that they entrusted the money to the defendant because he was like "a brother" to them. The money these investors provided to the defendant was for their retirement and the future of their children,

---

[2] The government expects several of the investors to be present at the sentencing hearing and some have expressed their desire to address the Court.

grandchildren, and a charitable foundation. Every year, the defendant provided the investors with quarterly statements and IRS 1099s showing that the great return he promised on their investment was being fully realized. After learning about the fraud and realizing that nearly the entire investment was gone, the investors now believe their "brother" simply "befriended [them] for the sole purpose of scamming [them] from the start." In addition, the investors explained the grueling mental and physical toll the entire ordeal has taken on their family.

Another investor provided the defendant with $390,000 in 2014. (PSR ¶ 31). The following year, she became terminally ill and passed away on February 2, 2016. The investor's father, who was not wealthy, met with the defendant after his daughter's death. The defendant assured the investor's father that the $390,000 investment would support his grandchildren and their college education. The investor's father believed that his grandchildren's financial future was secure. But it was all a lie. Now, the harsh reality for the investor's family is a total loss of $141,300 on the investment.

Likewise, another investor provided the defendant with $100,000 in 2014. (PSR ¶ 36). Each year after the initial investment, the defendant provided the investor with quarterly statements and IRS 1099 forms showing a great return on the investment. Now, the investor is struggling to comprehend how $100,000—earned in a family business after years of hard, reputable work—is gone. As a result of the theft, the investor has endured nightmares, insomnia, and "lost faith in the ability to trust others."

The defendant's crime has had a dramatic financial and emotional impact on those individuals who invested money with him. The repercussions from his greed will be felt by many people for a long time. There can be little doubt that the grand scale of the defendant's fraud is deserving of significant punishment.

  B.  <u>History and Characteristics of the Defendant</u>

The defendant worked for years as a real estate agent and real estate developer in the Waunakee area. By all accounts, he was successful at both professions. He lived a comfortable suburban life with his wife and three healthy children. He was living the American dream. But all that he had accomplished somehow left him unsatisfied. He wanted more money to complete a real estate project. But it is certainly not money he needed. And he willingly risked everything in his life to steal an unfathomable amount of money from his friends and associates.

While certain white-collar crimes involve a faceless victim (such as a bank or the federal government), the defendant preyed upon individuals who knew and believed in him. The interviews of the investors along with the victim impact letters filed with the Court contain a central theme — the investors genuinely believed in the defendant's false portrayal of himself as trustworthy, compassionate, respectful, and generous. The defendant, by all accounts, appeared to be a pillar of the Waunakee community. However, the defendant chose not to honor the community's trust, and instead exploited it to benefit himself financially at the expense of the some of his closest friends.

Furthermore, the defendant's words and conduct—both before and after the fraud scheme was revealed—show a total lack of a moral compass. While the scheme was ongoing, the defendant was living two lives: one life as a pillar of the community; and a second as a morally bankrupt conman. When the IRS agent interviewed him at his residence, the defendant calmly lied to the federal agent about his criminal activity. The opportunity to finally admit all of his lies, deceit, and theft was standing right before him. But the defendant's moral conscience failed him yet again. And, after the agent left, and with seemingly no hesitation, the defendant continued to collect large amounts of money from his investors.

After the fraud scheme was revealed, the defendant met with certain investors to explain his actions. During these meetings, the defendant had an opportunity to tell the truth and accept responsibility. But once again he chose the wrong path. Rather than admit that the invested money was gone and would not be repaid, the defendant promised to deed land (Grand Legacy property) to them to pay back the debt. As lies go, this one was a whopper. To this date, the Grand Legacy property remains unsold and will likely be subject to foreclosure.

When the Court looks at the totality of events leading up to and following the unmasking of the defendant's scheme, it is clear that the defendant lies and manipulates with no apparent regard for the consequences of his deception. Whether he feels any true remorse for the damage he has inflicted on the investors is a question only he can answer. However, it certainly does not appear so after examining the undisputed facts of this case alongside the victim impact statements. His history of lies, deception, and

greed portend a significant risk of reoffending upon his release from prison. The Court should have great concern about the defendant's high risk of recidivism.

C. <u>Respect for the Law and Just Punishment</u>

The government's investigation revealed that the defendant's criminal conduct was premediated, flagrant, greed-driven, selfish, and seemingly without remorse. On a grand scale, he lied to and cheated even those closest to him. A lengthy prison sentence and period of supervision is necessary to deter such conduct both by the defendant and others who would commit large-scale financial fraud. This type of deterrent is crucial because white-collar criminals "act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity." *United States v. Warner*, 792 F.3d 847, 860–61 (7th Cir. 2015). They are, therefore, "prime candidates for general deterrence." *Id*. at 860 (quoting *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013)); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (stating that white-collar criminal are "prime candidates for general deterrence" because "economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity."). A sentence of 108 months will change that calculus for other individuals who may be tempted to take advantage of their friends and associates in order to line their own pockets.

## RESTITUTION

In the defendant's plea agreement, the parties agreed that the appropriate restitution figure was $9,686,848. Since the time of the plea agreement, the defendant

8

has sold certain items of property, and $500,000 from those sales has been distributed to the victim investors in pro rata shares. Therefore, the proper restitution figure at the time of the sentencing hearing will be $9,686,848, and the Court should note on the record at sentencing and in the criminal judgment that the defendant's criminal restitution balance should be credited with the $500,000 he has repaid to the victims.

In addition, the parties expect that the following amounts will be distributed to the victim investors once the Court enters a final restitution order: 1) $346,319.37 currently held by the government and previously seized from the defendant's bank accounts; 2) $688,571.16 currently held by the Clerk of the Court from the sale of property and a $160,000 payment by the defendant's daughter for criminal proceeds the defendant gave her for a down payment on a house; 3) $298,085.40 currently held by Forward Partners LLC from the sale of the defendant's property. Once these distributions are made, the defendant's total restitution amount should be reduced accordingly.

The government anticipates that the defendant will ask for a reduced sentence based on his efforts to liquidate assets in order to pay restitution to the investors.[3] As an initial matter, it is important to note that many of the assets the defendant sold were obtained with proceeds from his fraud scheme. The Court should not reduce the defendant's prison sentence simply for attempting to sell his ill-gotten property.

---

[3] The defendant asserts that he "worked 75 to 90 hours per week most of last year on improving the Grand Legacy land and the other real estate properties." (PSR ¶ 80).

Moreover, while the defendant's efforts to liquidate his extensive property holdings have been adequate, it is not an appropriate basis for a downward variance. In examining whether a defendant's efforts to pay restitution merit a variance, the Seventh Circuit places heavy emphasis on the degree of voluntariness involved in making the restitution payments. *See United States v. Filipiak*, 466 F.3d 582, 584 (7th Cir. 2006); *United States v. Repking*, 467 F.3d 1091, 1096 (7th Cir. 2006); *United States v. Hendrickson*, 22 F.3d 170, 176 (7th Cir. 1994). If a defendant is statutorily required to make restitution, payments paid prior to sentencing do "little to support [a] below-range sentence." *Repking*, 467 F.3d. at 1096. Here, the defendant was subject to mandatory restitution under the MVRA and he sold certain pieces of property to prevent the government from taking civil forfeiture under 18 U.S.C. § 981(a)(1)(C). Therefore, his efforts to sell property to pay restitution were far from voluntary.

Furthermore, the defendant has failed to pay restitution in an amount even close to the amount he stole from the investors. *See United States v. Grasser*, 312 F.3d 336, 340 (7th Cir. 2002) (noting that the defendant's restitution payments were not exceptional because she paid only 42% of the amount owed and concluding that a below guidelines sentence on that basis was not appropriate). Even after the three categories of restitution detailed above are distributed post-sentencing, the defendant will have paid the investors only 19% of the total funds that he stole.

Finally, upon closer inspection, the defendant's claim that he worked tirelessly to sell assets overstates his actual efforts. For example, the government filed a civil forfeiture action against the defendant's personal residence on August 13, 2018 (18-cv-

10

00667-wmc). Yet, the defendant did not attempt to sell the home until nearly eight months later. Furthermore, while the defendant asserts that he worked tirelessly to improve the Grand Legacy property, the reality is the property still has not been sold and is currently the subject of a foreclosure proceeding. Therefore, the defendant's efforts to improve the Grand Legacy property, even if substantial, so far have been in vain.

## CONCLUSION

Based on the serious nature of the defendant's convictions, and after full consideration of the relevant § 3553(a) factors, the government asks the Court to impose a sentence of 108 months in prison, three years of supervised release, and a restitution order of $9,686,848. Pursuant to the plea agreement, the government also asks the Court to impose a money judgment of $9,686,848.

Dated: July 25, 2019

Respectfully submitted,

SCOTT C. BLADER
United States Attorney

By:   /s/
AARON D. WEGNER
Assistant United States Attorney