# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

UNITED STATE OF AMERICA,

        Plaintiff,        Case No. 3:19-cr-00044

v.

PATRICK O'CONNOR,

        Defendant.

## SENTENCING MEMORANDUM ON BEHALF OF PATRICK O'CONNOR

The sentencing hearing on July 30, 2019 will resolve the future of a man who failed his friends, his family and himself. Mr. Patrick O'Connor, now 61 years old, led an exemplary life for his first 54 years. As the son of hard-working parents, including a father who continued a path of employment despite blindness, and the brother of six accomplished men, as well as the husband for 39 years of a loving wife, we now try to evaluate just how wrong things went for Pat when he began violating the law beginning at some point in 2011.

The PSR accurately shows much of the history before the violations. It doesn't focus on Pat's hard, and honest, work as a small but successful real estate developer. He successfully developed several projects and it was through the business of developing home lots that he met one of the victims, Mr. Robert Landsee. Mr. Landsee purchased one of the lots Pat developed in 2005 for approximately $300,000, and Mr. Landsee used Pat's recommendations for a builder who then built his residence. They developed a friendship and spent time together over the years before Mr. Landsee entered into an investment arrangement with Pat about six or

seven years after the initial lot purchase. During this same period of years, Pat worked with and developed a friendship with Mr. William Paulson and his wife. Their work together involved development of land and the friendship included the two couples going to the Paulson vacation home.

In retrospect, it might be easy to say that Pat bit off more than he could chew when he bought the 340 acres and some conjoined pieces of property with a view of Lake Wisconsin. The purchase of the acreage occurred in 2004. To those (such as the undersigned attorneys) who have seen other developers fail and even violate various laws in the process, bare land such as the 340 acres is a financial load to carry. The land has potential, but before it can be developed, it does not create any revenue and instead only costs money to feed the purchase and any improvements. Here, Pat handled the costs of the undeveloped land, such as the mortgage, taxes and many improvements, from his own funds until about 2011. Well before the violations occurred, Pat built his home in 2000 on a lot in one of his developments which sold in 2019.

It is understood that the financial world took a nose dive in 2008 with some recovery a year or so later for much of the country, but for Pat, by 2011, there hadn't been a major turnaround in his real estate business. At some point, he decided to be a day trader through his account at TradeStation brokerage. As the PSR shows, he convinced himself that he could be a successful day trader. Unfortunately, as again seen by those of us who are involved in the financial markets, we see that day traders more often than not lose money after time, unless they are able, or lucky enough, to quit when ahead. Pat did not quit when ahead, and his day

trading per the IRS calculations showed a loss of approximately $3,200,000 (see PSR p. 6, para 16).

Pat accepted responsibility for his actions in June of 2018, before the investigators contacted him. He could not "live the lie" after he learned from Mr. Paulson that the investigators were reaching out to his clients. Before contacting legal counsel, Pat met with Mr. Landsee on June 16, 2018 and gave him a detailed confession with specific amounts he had stolen. (See attached Exhibit A, a copy of the R. Landsee interview report of June 20, 2018.) He then met with the Paulsons and confessed to all of his thefts and explained he had provided them with false statements in order to cover up his theft. (See PSR, p. 7) Pat then went to the Farmers & Merchant Bank where he confessed to defrauding investors.

These actions by Pat O'Connor are insightful in another way. The defense has objected in its Rule 32 objections to the statement that Pat continued to take money from investors "after the defendant was interviewed by investigators." At first blush, his denial of knowledge that he was being investigated could appear to be self serving. But upon closer scrutiny, we now know how he would act upon learning they are investigating him by the way he did act in June 2018. He did not know in October 2017 that it was an actual criminal investigation but only learned it was in June 2018 when he started meeting with his investors to confess his thefts and stop living the lie.

## SENTENCING CONSIDERATIONS AND
## APPLICATION OF 18 U.S.C. § 3553 TO THE IMPOSITION OF SENTENCE

The PSR dated June 11, 2019 calculates Patrick O'Connor's total offense level at 30 with a criminal history category of I, and a guideline imprisonment range between 97 to 121

months. The base offense level is 7 but the specific offense characteristic has a 20-level increase because the amount of loss exceeds $9,500,000.00. (See PSR, page 18, ¶ 84-85)

As this Court well knows, the sentencing guidelines are advisory and have been since 2005, following the *Booker* decision. Title 18 U.S.C. § 3553(a) sets forth statutory sentencing factors, including,

> the need for the sentencing posed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of these defendants; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Given Mr. O'Connor's age (61 years old), his loss of all of his assets and reputation, and his extensive efforts over the past 13 months to maximize restitution for the victims, there is no need for a lengthy sentence to protect the general public and the victims from Mr. O'Connor. The question becomes: how much time is enough for a 61 year old man who has lost everything except for most of those in his family. The defense acknowledges this was a very serious offense.

The defense also understands that the personal punishment, given the extensive facts of this prosecution, will include incarceration. The sentencing Guidelines that are based in large measure on the amount of money involved with the crime, call for a range of incarceration between 97 to 121 months.

There is a direct analogy to the case of Douglas Weinkauf (16-cr-00086-wmc WDWI). There are few distinguishing and aggravating factors in the Patrick O'Connor case that separate it from Mr. Weinkauf's matter whose fraud involved a larger dollar amount, there were more

victims, the sophistication was similar, the fraud occurred over similar lengths of time and other factors. Here, for Mr. O'Connor, a 36-month sentence would capture the gravity of Mr. O'Connor's conduct but it would also acknowledge the mitigating factors previously addressed.

Douglas Weinkauf appeared before this Court having pled guilty to a long running fraud that left a trail of victims. He utilized his special skills and perpetrated the extensive fraud that ended in a 36-month sentence where the Guideline calculation was exactly the same as for Patrick O'Connor. Some consideration seems to have been given due to his cooperation but we submit Mr. O'Connor's confessions to his victims with no ulterior motive or gain is true acceptance of responsibility and remorse.

The concept of deterrence from criminal behavior is generally divisible into categories of specific and general deterrence. As for any specific deterrence to Patrick O'Connor, there is little doubt that he will not again take any actions to defraud others or to engage in dishonesty in connection with operating any business. At age 61 and with the public nature of his actions, there simply is no practical likelihood for a recurrence of the activity. Further, and more importantly, Mr. O'Connor has shown both remorse and a goal to obtain restitution for the victims.

The concept of general deterrence incorporates the idea that by prosecuting an individual, the government engenders a fear of prosecution in those who are considering engaging in wrongdoing. The concept can be broken down further into categories of absolute general deterrence and marginal general deterrence.

In social science, studies regarding general deterrence are relatively well settled. Evidence suggests that in the absence of the threat of any punishment for criminal conduct, the social fabric of society would dissipate, because crime would escalate and significantly diminish the capacity of people to lead safe and fulfilled lives.[1] Therefore, general deterrence works in the absolute sense because there is a connection between the existence of an apparatus to enforce criminal law, some form of criminal sanction against criminal conduct, and compliance with the law. That is, if there are criminal laws that are enforced by the government, criminal conduct is decreased. In order for absolute general deterrence to be achieved, there must be some detriment to criminal activity, a hardship that people would seek to avoid. However, it is well settled that the hardship does not need to be a particularly onerous penalty in order to instill absolute general deterrence.

Research has consistently shown that certainty of being caught and punished has a deterrent effect.[2] But increasing the severity of punishment does not yield significant, if any, marginal deterrent effects. *Id.* This conclusion is based on three National Academy of Science Panels, which reached that foregoing conclusion, as has every major survey of the evidence. "Certainty of punishment is empirically known to be a far better deterrent than its severity."[3]

In contrast to absolute general deterrence, marginal general deterrence – the theory that there is a correlation between incrementally higher penalties and reduction in crime rates – is flawed. The National Academy of Sciences notes, "the incremental deterrent effect of

---

[1] Mirko Bagaric, Victoria Lambropolous, Lidia Xynas, Excessive Criminal Punishment Amounts to Punishing the Innocent: An Argument for Taking the Parsimony Principle Seriously, 57 S. Tex. L. Rev. 1, 27 (2015)
[2] *See* Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006).
[3] Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime,* 8 Cardozo J Conflict Resol. 421, 447-48 (2007).

increases in lengthy prison sentences is modest, at best." Nearly 90% of criminologists believe marginal general deterrence does not work.[4]

The findings of the Institute of Criminology at Cambridge University on general deterrence are typical.[5] The Institute's report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. It examined the effects of changes to both the certainty and severity of punishment. *Id.* at 1. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates...were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment.[6]

As regards Patrick O'Connor, his experiences will serve as a general deterrent to any other white collar individuals who might be considering using deception and fraud to raise money for business ventures. Mr. O'Connor has lost not only all of his assets and his reputation, but he also has lost the respect and companionship of a son and grandchildren.

---

[4] *See* Michael L. Radelet & Traci L. Lacock, Do Executions Lower Homicide Rates?: The Views of Leading Criminologists, 99 J. CRIM. L. & CRIMINOLOGY 489, 503-04 (2009).
[5] *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).
[6] *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995); see also Gabbay, supra, at 448-49 ("[T]here is no evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.")

# CRITICISM OF THE WHITE COLLAR SENTENCING GUIDELINES

United States sentencing guideline §2B 1.1 has been criticized for producing unreasonably high sentencing ranges. In a Yale law review note examining the trends in sentencing in white collar cases, especially in the Southern District of New York, the author found the frequency with which below guideline sentences were imposed increased from around 10 percent before the Booker decision to 30 percent just after Booker to around 50 percent by the year 2010.[7] By 2012, nearly 70 percent of the defendants in serious white collar cases in the Southern District of New York received sentences below the guideline range. *Id.* From a national perspective, about 47 percent of white collar offenders received below guideline sentences, and 25 percent of those received non-government sponsored below guideline range sentences. *Id.* That means that even in cases where the government did not request a below guideline range sentence, the district court nevertheless imposed a sentence below the advisory guideline range.

According to the author, this means district courts frequently find the guideline sentencing range in major white collar cases inappropriately harsh. The extent of variance below the guidelines for non-government sponsored below range sentences was between 50 and 70 percent shorter than the bottom of the guideline range on average. *Id.*

One possible explanation for these significant variances from advisory sentencing ranges is courts are uncomfortable relying on loss amount as a proxy for culpability. While it remains theoretically possible that loss is the best indicator of a defendant's culpability, the

---

[7] Jillian Hewitt, Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases, 125 Yale L.J. 1018, 1041 (2016)

sentencing commission has never conducted empirical research to explain why, exactly, loss is a good proxy for culpability.[8] It is merely assumed.

## RESTITUTION

To date, the sum of approximately $1,900,000.00 has been collected and will be available for restitution on behalf of the 5 investors. The entity consisting of the 3 larger investors known as Forward Partners has collected the sum of $798,085.00 as of June 20, 2019 and believes there are remaining items to be sold that would add an additional $30,000.00. The IRS seized the 2 brokerage accounts totaling $335,146.00 and a bank account with $11,173.00 in the account. There is a civil case involving forfeitures and, as shown in the PSR, the Clerk of Court holds $688,571.00. It is unknown to the writers of this Memorandum whether any of the totals include the pontoon boat that is the subject of an involuntary bankruptcy action with a value of approximately $35,000.00/$40,000.00 as well as another asset involving another boat.

The other remaining asset is the 340 acres near Lake Wisconsin. Mr. O'Connor purchased this property in 2004 and none of the illegal proceeds were used as part of the maintenance and carrying costs associated with the property until approximately the year 2011 or 2012. On October 10, 2012, James Rawson of Rawson Realty prepared an extensive appraisal of the 340 acres and set the appraised value at $7,778,000.00. The appraisal reflects that 40 individual lots had been approved by government authorities for single-family homes and the remaining 243 acres were restricted by a conservation easement with the requirement

---

[8] Joseph W. Luby, Reining in the "Junior Varsity Congress": A Call for Meaningful Judicial Review of the Federal Sentencing Guidelines, 77 Wash. U. L.Q. 1199, 1219 (1999).

that no homes be built on the conservation land. Rawson, an experienced appraiser of both residential and rural land, found that the highest and best use of the 340 acres was for a rural residential subdivision and stated that this was "financially feasible." Today, the 340 acre parcel is the subject of a foreclosure action by the bank holding the first mortgage. It is understood that the bank has or will obtain judgment that at the present time with interest allowed in the future to be at approximately $2,350,000.00.

Included in the funds held by the Clerk of Court are proceeds totaling $291,497.51 from the sale of the home owned by Patrick and Joan O'Connor. Under Wisconsin law, Joan O'Connor has a marital interest that essentially equals one-half of those proceeds or approximately $145,748.00. Joan O'Connor intentionally made no claim to retain that money even knowing that her husband would be going to prison and all of their assets had been seized or forfeited as restitution to the victims. Joan O'Connor, along with Patrick O'Connor, made the decision that these funds should go to the victims for additional restitution.

There is a large disparity in the amount of loss among the five victims. From the beginning of our representation of Mr. O'Connor in late June 2018, it was Pat's request and defense counsels' presentation to the Government and to the attorneys representing the three larger victims that the two smaller investors (the Sophas and Kellenbergers) be paid in full. Our request was addressed with the US Attorney's office to simplify restitution issues and to otherwise avoid any "claw back" or true up issues. Money was available to make the payment to the two smaller investors from the funds seized by, and in the control of, the Government. Unfortunately, our request was not accepted. Attached as Exhibit B is a letter of December 12, 2018 where the history of the request to pay the two smaller investors is

discussed together with copies of three emails also discussing the attempts for making the restitution.

Our rationale was simple. Both of these investors had special and specific monetary needs for full restitution and the pro rata share that has been proposed by the larger investors would result in virtually nothing for these two investors. In the Kellenberger situation, the investor was not a business person and only invested through the recommendation of Mr. Robert Landsee, and subsequently she died leaving young children in the care of the grandparents. (See PSR, p 8)

## CONCLUSION

We respectfully submit to the Court that a sentence of 36 months is sufficient to address the punishment and deterrent considerations discussed earlier, without minimizing the gravity of his conduct. At 61 years old, it may also give Mr. O'Connor sufficient time after his release to begin the long journey of paying restitution.

Dated this 25th day of July, 2019.

                                            **MURPHY DESMOND S.C.**
                                            Attorneys for Defendant

                                          By: /s/ *Bruce J. Rosen*
                                                Bruce J. Rosen
                                                State Bar No. 1014182
                                                Stephen L. Morgan
                                                State Bar Number: 1015099
                                                33 East Main Street Suite 500
                                                P.O. Box 2038
                                                Madison, WI 53701-2038
                                                (608) 257-7181

**Certificate of Service**

I hereby certify that I served a true and correct copy of the foregoing electronically filed document(s) upon the United States Attorney's Office for the Western District of Wisconsin via the Court's ECF system.

Dated this 25th day of July, 2019.

By: /s/ *Stephen L. Morgan*
Stephen L. Morgan
State Bar No. 1015099